IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Civil Action No. 04-cv-00396-LTB-KLM

HOWARD MYERS, individually and as next best friend of ETHAN MYERS and LUKAS MYERS, minors,

       Plaintiffs,

v.

MID-WEST NATIONAL LIFE INSURANCE COMPANY a/ka or d/b/a or separately; MID-WEST NATIONAL LIFE INSURANCE COMPANY OF TENNESSEE,

       Defendant.

---

## ORDER

---

This case is before me on Defendant Mid-West National Life Insurance Company of Tennessee's ("Mid-West") Motion for Summary Judgment [Doc # 177]. After consideration of the motion, all related pleadings, and the case file, I grant the motion as set forth below.

## I. Facts

The following facts are undisputed unless otherwise noted. On January 15, 2002, Plaintiff Howard Myers met with Kenneth Kochan, an insurance salesman selling Mid-West policies. During this meeting, Mr. Myers signed an application for health insurance which indicates that Mr. Myers was requesting insurance coverage for himself and his three children, including Plaintiffs Ethan and Lukas Myers. The application further indicated that Mr. Myers had undergone a nephrectomy, or the removal of a kidney, in 1994 and identified Mr. Myers' doctor as "Dr. Kurt Wever."

The application includes a section titled "Declarations and Agreements," which provides that the proposed insured agrees among other things that

> ... (c) the agent does not have the authority on behalf of the Company to accept the risks, or to make, alter, or amend the coverage or to extend the time for making any payment due on such coverage and (d) no insurance will take effect unless and until the Application is approved by the Company and the policy is delivered to the Applicant while the conditions affecting the insurability are and have remained as described herein and the first premium has been paid in full.

Mr. Myers also signed a form entitled "Confirmation of Presentation and Conditional Receipt" (the "Confirmation") and a medical records release form during the January 15, 2002 meeting with Mr. Kochan. The Confirmation contains the following language:

> At my request, [Mr. Kochan], visited me to determine my interest in applying for insurance with [Mid-West]. ... [Mr. Kochan] explained to me that the insurance that I have applied for, including insurance applied for on any dependents listed on the application, will not become effective until the policy is delivered by the Company and accepted by me. ...
>
> ...I authorize the check tendered with the application to be cashed immediately upon receipt by the home office. [Mr. Kochan] has explained to me that the Company's cashing of my check does not create coverage with the Company and should the Company fail to approve my application for coverage, I will receive a full refund of all monies given to [Mr. Kochan] for the insurance I have applied for.
>
> ...
>
> I understand that coverage is not effective unless and until approved by the Company.

The medical records release form similarly provides that the applicant "understand[s] that coverage is not effective unless and until approved by the Company."

Mr. Myers tendered a check in the amount of $376.11 to Mr. Kochan with his application. Mr. Myers asserts that he "was informed and understood this would bind insurance coverage with Mid West." Mr. Myers further asserts that Mr. Kochan "represented that [he] had

nothing to be concerned about" and that there would be "no problem" regarding Mid-West's issuance of health insurance for himself and his children.

Mr. Kochan met again with Mr. Myers on January 16, 2002. During that meeting, Mr. Myers completed a questionnaire regarding his nephrectomy but left blank the section requesting the names and addresses of all medical practitioners and dates of consultation. Then, on January 18, 2002, three days after Mr. Myers signed his application, Mr. Kochan sent the application to Mid-West. Mid-West's underwriting department received the application on January 22, 2002. That same day, Plaintiffs Ethan and Lukas Myers were seriously injured in an automobile accident.

On January 31, 2002, Mid-West sent Mr. Myers a letter indicating that they had received his application but needed medical records from Dr. Wever before the application could be "properly consider[ed]." Mid-West further indicated that it had asked a third party to obtain these records. On March 21, 2002, Mid-West sent Mr. Myers a letter indicating that it was unable to issue the health insurance coverage requested because it was "waiting on medical records from Dr. Weaver (sic)." On March 22, 2002, Mid-West issued three "refund" checks totaling over $300 to Mr. Myers. Mid-West did not pay any of the medical expenses incurred as a result of Plaintiff Ethan and Lukas Myers' January 22, 2002 automobile accident.

## II. Standard for Review

The very purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir. 1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex*, 477 U.S. at 324.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex*, 477 U.S. at 323. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson Liberty Lobby, Inc.*, 477 U.S. at 252; *Mares*, 971 F.2d at 494.

## III. Analysis

Plaintiffs' Amended Complaint in this diversity action asserts claims against Mid-West for fraud, negligence, breach of fiduciary duty, breach of contract, bad faith, violation of Colorado's Unfair Claims-Deceptive Practices Act (the "UCDPA"), and outrageous conduct. There is no dispute that where applicable, Colorado law controls. By the motion, Mid-West argues that it is entitled to judgment as a matter of law on all of Plaintiffs' claims.

### A. Application of the Law of the Case Doctrine

Mid-West first argues that Plaintiffs' claims for fraud, negligence, violation of the UCDPA, and outrageous conduct should be dismissed pursuant to the law of the case doctrine as a result of the Court's Order dated October 7, 2004, which dismissed these same claims against former Defendant Alliance for Affordable Services ("Alliance") under Fed. R. Civ. P. 12(b)(6). The law of the case doctrine "is discretionary rather than mandatory." *Homans v. City of Albuquerque,* 366 F.3d 900, 904 (10th Cir. 2004). In light of the fact that my October 7, 2004 Order related to a different party in another context governed by different legal standards, I decline to dismiss the relevant claims under this doctrine. Instead, I will independently analyze these claims along with Plaintiffs' other claims.

### B. Plaintiffs' Breach of Contract, Bad Faith, and Breach of Fiduciary Duty Claims

Mid-West argues that Plaintiffs' claims for breach of contract, bad faith, and breach of fiduciary duty must fail as a matter of law because it never issued an insurance policy to Plaintiffs. Plaintiffs concede that Mid-West never issued the requested health insurance policy. Nonetheless, Plaintiffs argue that they were effectively insured by Mid-West beginning January 15, 2002 as a result of Mr. Kochan's alleged representations on that date that Mr. Myers'

completion of the application and tender of the first premium payment created binding health insurance coverage from Mid-West.

Mid-West first asks me to reject Plaintiffs' argument in support of their claims for breach of contract, bad faith, and breach of fiduciary duty on the basis that it is inconsistent with the allegations in their Amended Complaint that Plaintiffs requested coverage and were assured that a policy meeting their specifications would be issued. *See* Amended Complaint, ¶¶ 6-8. The Scheduling Order similarly alleges that Mr. Myers "was told and assured that everything, meaning the issuance of his health insurance policy, was being handled in an expeditious fashion, that everything was in order, and that the policy for which they applied would be issued." Even if these allegations conflict with Plaintiffs' current position that they had insurance coverage from Mid-West beginning January 15, 2002, the conflict is not so obvious as to warrant rejecting Plaintiffs' argument without further consideration. *See Soo Line R.R. v. St. Louis S.W. Ry.,* 125 F.3d 481, 483 (7th Cir. 1997) ("[J]udicial efficiency demands that a party not be allowed to controvert what has already ***unequivocally*** told a court by the most formal and cosidered means possible.") (emphasis added).

Mid-West next argues that Plaintiffs' argument that Mid-West was bound to provide them with health insurance coverage beginning January 15, 2002 should be rejected on the merits. Plaintiffs first assert that they had binding health insurance coverage from Mid-West as a result of Mr. Kochan's status as a general agent of Mid-West. As a general agent of Mid-West, Plaintiffs argue that Mr. Kochan's alleged negligent misrepresentations regarding their health insurance coverage are binding upon Mid-West pursuant to *Cadez v. Gen. Cas. Co. of Amer.,* 298 F.2d 535, 537 (10th Cir. 1961). Alternatively, Plaintiffs argue that Mr. Kochan had either

actual or apparent authority to bind Mid-West to health insurance coverage for Plaintiffs.  "The acts or statement of an agent performed withing the scope of his real or apparent authority are binding upon the principal, regardless of whether the principal has actual knowledge of the agent's acts."  *Life Investors Ins. Co. of Amer. v. Smith,* 833 P.2d 864, 868 (Colo. App. 1992).

To establish that Mr. Kochan was a general agent of Mid-West, Plaintiffs point to the facts that Mr. Kochan worked on commissions based on the policies that he sold; that he sold Mid-West policies exclusively; and that Mark Anderson, one of Plaintiffs' purported expert witnesses, has provided an affidavit in which he opines in conclusory fashion that Mr. Kochan "was a general or captive agent, with the authority to bind [Mid-West] to the health insurance Mr. Kochan represented they were purchasing."  As set forth in my Order granting Mid-West's motion to strike, Mr. Anderson's opinion  will not be considered in determining Mr. Kochan's status because it expresses an unsupported legal conclusion.  The remaining evidence relied on by Plaintiffs' to establish that Mr. Kochan was a general agent of Mid-West is unpersuasive.

Tellingly, Plaintiffs cite no legal authority for the proposition that an agent selling an insurer's policy exclusively on commission in a set geographic area is a "general agent" of the insurer such that the agent's negligent misrepresentations are binding on the insurer under *Cadez*.  In fact, *Cadez* supports a contrary conclusion.  After recognizing the general principle that a general agent's negligent misrepresentations are binding upon the insurer, the Tenth Circuit went on to conclude that the insurance agent in question was not a general agent of the insurer because the agency agreement merely authorized him "to receive and accept proposals" and that as a soliciting or local agent he did not have the power to bind the insurer on any risk. *Id.*  Likewise here, Mr. Kochan's agency agreement with Mid-West authorized him "to solicit

applications on POLICIES offered by MID-WEST in a non exclusive territory." Mr. Kochan's agency agreement further provided that he would "submit every insurance application subject to acceptance or rejection at the SOLE DISCRETION of ... MID-WEST."

The language in Mr. Kochan's agency agreement also demonstrates that he did not have the actual authority to bind Mid-West by his alleged representations of coverage since "[a]ctual authority is considered authority which is actually given to an agent." *Life Investors,* 833 P.2d at 868. In *Life Investors*, the Colorado Court of Appeals proceeded to conclude that the insurance agent's responsibilities under his contract to solicit applications, collect premiums, and deliver policies included the authority to represent available coverages. *Id.* The Colorado Court of Appeals, however, did not go so far as to conclude that the insurance agent had actual authority to bind the insurer to the represented coverages. Rather, at issue in *Life Investors* was the review of an adverse decision by Colorado's Division of Insurance that the agent's misrepresentations were attributable to the insurer and that the insurer was therefore in violation of Colorado's insurance code as a result of these misrepresentations. Further, there is no indication that the agency contract in *Life Investors* contained the same limitations on the agent's authority as that at issue in this case.

Plaintiffs also argue that Mr. Kochan had the apparent authority to bind Mid-West to health insurance coverage for Plaintiffs. In contrast to actual authority, "apparent authority is that authority which the agent appears to third parties to have." *Life Investors,* 833P.2d at 868. Mid-West convincingly responds that Mr. Kochan could not have reasonably appeared to have authority to bind Mid-West to insurance coverage in light of the express limitations on Mr. Kochan's authority and the disclaimers regarding coverage that are set forth in the insurance

8

application and related documents.  As a result of these limitations and disclaimers, this case is distinguishable from *Life Investors* since the decision in that case was partly predicated on the fact that the prospective insureds' application did not provide contradictory information to that which they learned through the agents.  *Id.* at 868-9.  These limitations and disclaimers also preclude Plaintiffs' reliance on the rule of "reasonable expectations" to the extent that it would otherwise be applicable in this case.  Under this rule,

> if an insurer wishes to avoid liability, it must use clear and unequivocal language expressing its intent to limit temporary coverage.  When it does not do so, 'coverage will be deemed to be that which would be expected by the ordinary layperson, namely complete and immediate coverage upon payment of the premium.'

*Struble v. Amer. Family Ins. Co.,* 172 P.3d 950, 957 (*quoting Sanchez v. Connecticut. Gen Life Ins. Co.,* 681 P.2d 974, 977 (Colo. App. 1984)).

Plaintiffs attempt to nullify the language in the insurance application and related documents by asserting that Mr. Myers did not understand it.  Specifically, Mr. Myers asserts that

despite the inclusion of the concise statement that "I understand that coverage is not effective unless and until approved by the Company" just above his signature line on the Confirmation and medical records release form and the more extensive provisions contained in the application and the Confirmation to the same effect, he believed he had full and immediate health insurance coverage that could only be cancelled or declined if "anything ... was wrong on [the] application with [his] medical."  Plaintiffs further assert that this interpretation is reasonable in light of the fact that Mr. Kochan likewise did not understand the limitations and disclaimers in the documents he presented to Mr. Myers.  In fact, however, when Mr. Kochan was asked at his

deposition what the word "make" meant in subparagraph (c) of the Declarations and Agreements section of the application, which generally provides that Mr. Kochan does not have the authority to make insurance coverage, he responded

> ... to me it says I have no authority to make any decisions for the company; essentially take the application.
>
> ...
>
> It says I do not have the right to give them coverage myself.  To me that's what is says.

Whether a term is ambiguous is a matter of law to be determined by the Court.  *See Branscum v. Amer. Cmty. Mut. Ins. Co.,* 984 P.2d 675, 678 (Colo. App. 1999).  An insurance policy provision is ambiguous "when it is reasonably susceptible of more than one meaning." *Weitz Co., LLC v. Mid-Century Ins. Co.,* 181 P.3d 309, 311 (Colo. App. 2007).  I fail to see how the language contained throughout the documents signed by Mr. Myers can reasonably be interpreted to mean anything but that there was no health insurance coverage of Plaintiffs by Mid-West unless and until Mid-West approved Plaintiffs' application and delivered a copy of the policy to them and that Mid-West's acceptance of the premium check did not alter these prerequisites to coverage.  As such, I conclude that Mid-West is entitled to judgment as a matter of law that Mr. Kochan did not have the apparent authority to bind Mid-West to health insurance coverage for Plaintiffs.

Plaintiffs only remaining theory to establish binding health insurance coverage to support their claims for breach of contract, bad faith, and breach of fiduciary duty is the affidavit of Burt Bernstein in which he opines that

... based on industry standards, the insurance policy that Mr. Kochan represented to the Myers would issue, was effective the date that the application and the funds were received by Mr. Kochan, which was January 15, 2002, and at the very latest, January 21, 2002, when the funds and the application actually arrived at Defendant Mid-West's offices.

There are numerous problems with this affidavit as discussed in my Order on Mid-West's motion to strike. In addition, this opinion is contradicted by a large number of authorities cited in Mid-West's reply brief and is therefore unreliable. *See e.g. Griffin v. State Fram Fire & Casualty Co.,* 104 P.3d 283, 286 (Colo. App. 2004) ("When customer signed and returned the application and premium, the parties were still in the negotiating stage, pending the receipt of the completed application, completion of the underwriting process, acceptance by insurer, and issuance of a binder and policy."); Am. Jur. 2d Insurance § 223 (2008) ("The acceptance of the application of proposal for insurance is necessary to make the policy of insurance binding and effective, especially if, by the terms of the application, its approval is required before the risk attaches. ... [A]ccepting a premium payout, in and of itself, does not constitute acceptance of an insurance policy"). I therefore conclude that Mr. Bernstein's affidavit likewise fails to raise a triable issue as to whether Mid-West was bound to health insurance coverage for Plaintiffs in January of 2002 notwithstanding the fact that no insurance policy was ever issued.

In the absence of an insurance policy issued to Plaintiffs or a legal basis to support coverage based on the alleged misrepresentations of Mr. Kochan, Plaintiffs' claims for breach of contract and bad faith must fail as a matter of law. *See Western Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo. 1992) (to state a claim for breach of contract, a plaintiff must prove the existence of a contract); *Travelers Ins. Co. v. Savio,* 706 P.2d 1258,1268 (Colo. App. 1985) (an insurer's duty of good faith "derives from the relationship of an insured claimant to the provider

of benefits").  Plaintiffs' claim for breach of fiduciary duty must likewise fail as a matter of law

both because there was no contractual relationship between the parties and because this

relationship would not give rise to fiduciary duties on the part of Mid-West under the

circumstances of this case in any event.  *See Bailey v. Allstate Ins. Co.,* 844 P.2d 1336, 1339

(Colo. App. 1992) ("While there are circumstances ... in which fiduciary-like duties may be

placed on an insurer to benefit the insured, such situations do not arise in first-party disputes

between the insurer and the insured.").

## C.  Plaintiffs' Fraud Claim

The elements of claim for fraudulent misrepresentation are "(1) a fraudulent

misrepresentation of material fact; (2) the plaintiff's reliance on the material representation; (3)

the plaintiff's right or justification in relying on the misrepresentation; and (4) reliance resulting

in damages."  *Nielson v. Scott,* 53 P.3d 777, 779-80 (Colo. App. 2002).

Mid-West argues that Plaintiffs' fraud claim must fail as a matter of law because

Plaintiffs cannot establish any of the four elements and because they cannot establish that the

alleged fraudulent misrepresentation was made within the scope of Mr. Kochan's authority.  The

arguments in Mid-West's motion regarding this claim assume that it is predicated on Plaintiffs'

assertion that Mr. Kochan represented that a health insurance policy would be issued to them in

the future.  As previously noted, however, Plaintiffs now assert that Mr. Kochan told them that

they were insured beginning January 15, 2002 when Mr. Myers completed the application for

insurance and tendered the first premium payment.  Again, I decline to reject Plaintiffs' fraud

claim strictly on the basis that their current position regarding the basis for this claim is arguably

inconsistent with the allegations in their Amended Complaint and will analyze whether there is a

genuine issue for trial regarding Mr. Kochan's alleged fraudulent misrepresentation that Plaintiffs had binding health insurance coverage beginning January 15, 2002.

Additionally, Plaintiffs' response asserts that Mr. Kochan fraudulently misrepresented (1) that he and his wife were insured by a Mid-West health insurance policy that was similar to that which Mr. Myers sought to obtain; (2) that Plaintiffs would be insured for 100% coverage up to one million dollars with a $5,000 deductible; (3) that a written policy would be sent to Plaintiffs within a week or two; (4) that "he would take care of everything" upon hearing that Ethan and Lukas Myers had been hospitalized following the automobile accident; and (5) that Plaintiffs' application was going though okay when in fact he had yet to even send it to Mid-West. These alleged misrepresentations likewise largely relate to health insurance coverage from Mid-West that was purportedly already in effect. Accordingly, these representations will be analyzed concurrently with Mr. Kochan's alleged misrepresentation that Plaintiffs had binding health insurance coverage from Mid-West beginning January 15, 2002 unless otherwise noted.

Plaintiffs have presented sufficient evidence to create a genuine issue for trial on the question of whether Mr. Kochan made fraudulent misrepresentations of existing material facts regarding Plaintiffs' health insurance coverage. Plaintiffs must, however, further present sufficient evidence to create a triable issue that Mid-West is liable for any such misrepresentations. Once again, Plaintiffs rely on Mr. Kochan's purported status as a general agent of Mid-West to establish Mid-West's liability for his actions but present no admissible evidence or legal authority to support the conclusion that Mr. Kochan was in fact a general agent of Mid-West. Likewise, I have already concluded that there is no triable issue regarding whether Mr. Kochan had the actual or apparent authority to bind Mid-West to his representations of

coverage. As such, Mid-West cannot be held liable for Mr. Kochan's alleged fraudulent misrepresentations as a matter of law.

Much of the same analysis that led to my conclusion that there is no triable issue regarding Mr. Kochan's authority to bind Mid-West to insurance coverage for Plaintiffs also supports the conclusion that Plaintiffs were not justified in relying on Mr. Kochan's alleged misrepresentations in any event. Specifically, the clear and unambiguous limitations on Mr. Kochan's authority and the disclaimers regarding coverage that are set forth in the insurance application and related documents that Mr. Myers signed on January 15, 2002 render Plaintiffs' reliance on Mr. Kochan's alleged representations of immediate insurance coverage unreasonable as a matter of law. *See Balkind v. Telluride Mountain Title Co.,* 8 P.3d 581, 587 (Colo. App. 2000) ("If the plaintiff has access to information that was equally available to both parties and would have led to the discovery of the true facts, the plaintiff has no right to rely upon the misrepresentation.").

Plaintiffs' failure to create a triable issue regarding their ***justifiable*** reliance on Mr. Kochan's alleged representations provides an alternative basis to enter judgment as a matter of law in favor of Mid-West on Plaintiffs' claim that Mr. Kochan fraudulently misrepresented that Plaintiff had binding health insurance coverage from Mid-West beginning January 15, 2002. Plaintiffs' allegations that Mr. Kochan fraudulently misrepresented that he and his wife were insured by a Mid-West health insurance policy that was similar to that which Mr. Myers wanted to obtain and that Plaintiffs' application was going through okay when it had not yet been sent arguably do not fall within this category and require additional analysis.

First, Mr. Kochan's alleged representations regarding his own health insurance coverage from Mid-West may, at most, have induced Plaintiffs to apply for a Mid-West health insurance policy. These representations could not, however, have caused Plaintiffs' claimed damages in the form of unpaid medical bills for Ethan and Lukas Myers because they cannot reasonably be construed as a guarantee that Plaintiffs would likewise be issued the same coverage from Mid-West.

Second, Plaintiffs' claim that Mr. Kochan fraudulently misrepresented that Plaintiffs' application was going through okay when it had not yet been sent must fail as a matter of law because Plaintiffs have not presented any evidence to support a finding that Plaintiffs' application had not been sent to Mid-West when this representation was made to Plaintiffs. Mid-West has, however, presented evidence that Mr. Kochan delivered the note to Plaintiffs in which he indicated that their application was going through okay at some point after the accident involving Ethan and Lukas Myers on January 22, 2002. No detrimental reliance by Plaintiffs in failing to timely obtain other health insurance coverage can therefore be attributed to this representation.

Accordingly, Plaintiffs' fraud claim fails as a matter of law because they cannot create a triable issue regarding Mid-West's liability for Mr. Kochan's alleged misrepresentations or their reasonable and detrimental reliance on them.

**D.  Plaintiffs' Negligence Claim**

Plaintiffs allege that Mid-West was negligent in processing their application for insurance. More specifically, Plaintiffs argue that Mr. Kochan was negligent in waiting until January 18, 2002, or two days after he obtained all of the necessary information from Plaintiffs,

to send the application to Mid-West by federal express and that Mid-West was negligent in not approving Plaintiffs' application for insurance upon receipt with no further inquiry.

The elements of a negligence claim are (1) the existence of a duty; (2) a breach of that duty; (3) causation; and (4) damages. *Redden v. SCI Colorado Funeral Servs., Inc.,* 38 P.3d 75, 80 (Colo. 2001). Mid-West argues that Plaintiffs' negligence claim must fail as a matter of law because they are unable to establish the breach of any duty or that any such breach caused damages to Plaintiffs. I agree.

In support of their assertion that Mr. Kochan first breached a duty owed to Plaintiffs by waiting two days to send their application for health insurance to Mid-West, Plaintiffs rely on the affidavit of purported expert Mark Anderson. Although Mid-West has challenged Mr. Anderson's affidavit on a number of meritorious grounds, I will assume for present purposes that Mr. Anderson's affidavit contains admissible opinion testimony that

> Mr. Kochan should have faxed or Federal Expressed the application and the form related to the nephrectomy the day that he received them. Had he done this, those documents should have arrived at Mid-West's offices no later than Wednesday the 16th or Thursday the 17th. Mid-West should have approved the application based on the underwriting guidelines on that day or within a day or two after, but no later than January 21, 2002.

Thus, Mr. Anderson's opinion assumes that if Mr. Kochan had sent the application to Mid-West two days earlier, Mid-West had a duty to issue a health insurance policy to Plaintiffs no later than January 21, 2002, or the day before the accident involving Ethan and Lukas Myers. If Mid-West had no such duty, then Mr. Kochan's alleged breach of his duty to send the application to Mid-West no later than January 16, 2002 could not have caused any damages to Plaintiffs as a matter of law.

The question of whether Mid-West had a duty to issue a health insurance policy to Plaintiffs without further inquiry depends on an analysis of Mid-West's underwriting guidelines regarding applicants like Mr. Myers who have undergone a nephrectomy. These guidelines provide that an attending physician's statement may be requested for applicants who have had a kidney removed and breaks this surgical procedure down into three categories: (1) those "[d]ue to trauma or donor transplant or congenital 0-5 years;" (2) those "[o]ver 5 years;" and (3) those "due to disease or recipient." Two representatives of Mid-West expounded on these guidelines in their deposition testimony. Specifically, Doug Kornegay, the manager in Mid-West's underwriting department at the time Plaintiffs' application was submitted, testified that the underwriting guidelines required an attending physician statement if an applicant "ever had a nephrectomy, ever." Suzanne Wilson, an underwriter at Mid-West, testified that no attending physician statement would be requested if the nephrectomy was due to disease or recipient because insurance coverage would automatically be denied under those circumstances but that Mid-West "did not have a time limit as to when [it] would not request an attending physician statement" regarding kidney removals due to trauma or donor transplant.

There is therefore strong undisputed evidence that Mid-West did not breach any duty to Plaintiffs by not accepting their application for health insurance coverage without further inquiry into Mr. Myers' nephrectomy 7-8 years earlier. This inquiry would necessarily take some period of time especially since Plaintiffs' application materials only identified one doctor for Mr. Myers and that doctor had never even treated him. Thus, even if Mr. Kochan had a duty to submit Plaintiffs' application to Mid-West no later than January 16, 2002, his breach of that duty could not have caused Plaintiffs' damages as a matter of law because Mid-West's earlier receipt of the

application still would have left Mid-West with, at most, only three-four business days to obtain and review Mr. Myers' medical records prior to the accident on January 22, 2002. *See Worden v. Farmers State Co., Inc.,* 349 N.W.2d 37, 40 (S.D.1984) (an insurer's delay in acting upon a life insurance application "caused by the insurer's diligent attempts to obtain information material to the risk cannot constitute negligence."). Any delay by Mid-West in obtaining Mr. Myers' medical records after the accident is irrelevant since this significant change in circumstances extinguished any duty that Mid-West had to issue health insurance to Plaintiffs. *See* Insurance Application ("no insurance will take effect unless and until the Application is approved by the Company and the policy is delivered to the Applicant ***while the conditions affecting the insurability are and have remained as described herein....***") (emphasis added). *See also Shaner v. West Coast Life Ins. Co.,* 73 F.2d 681, 685 (10th Cir. 1934) (provision in application for health insurance that insurance would not go into effect unless the applicant was in the same condition of insurability as when the application was signed was valid and enforceable).

Although no additional information may have been needed regarding the health histories of Ethan and Lukas Myers, Plaintiffs have failed to cite any legal authority for the proposition that an insurance company is obligated to separately issue insurance coverage to minors when further investigation is needed regarding the primary and joint applicant. Thus, there is likewise no triable issue regarding whether Mid-West breached a duty to Ethan and Lukas Myers by failing to issue health insurance to them while it was awaiting Mr. Myers' medical records.

Because Plaintiffs cannot establish that any breach of duty by Mr. Kochan in sending Plaintiffs' application to Mid-West on January 18, 2002 caused them damages or that Mid-West

breached a duty to them by not approving their health insurance application without further inquiry, Mid-West is entitled to judgment on Plaintiffs' negligence claim as a matter of law.

**E. Plaintiffs' Outrageous Conduct Claim**

The elements of a claim for outrageous conduct under Colorado law are (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in the conduct recklessly or with the intent of causing the plaintiff extreme emotional distress; and (3) that the plaintiff incurred severe emotional distress which was caused by the defendant's conduct. *Culpepper v. Pearl Street Bldg., Inc.,* 877 P.2d 877, 882 (Colo. 1994). "'Outrageous conduct' is defined as conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Id.* (*quoting Destefano v. Grabian,* 763 P.2d 275, 286 (Colo. 1988)). "Although the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of the court to determine whether reasonable persons could differ on this issue." *Id.* at 883.

Plaintiffs outrageous conduct claim is predicated on their assertions (1) that Mid-West "probably knew that the Plaintiff Howard Myers' children had been involved in a serious automobile accident;" (2) that Mid-West "knew that Plaintiffs were probably going to incur and (sic) an extraordinary amount of medical expenses for which they would be looking to Mid-West for health insurance coverage;" and (3) that Mid-West "knew that delaying and/or denying the insurance claims of the plaintiffs were substantially certain to cause severe emotional distress to the plaintiffs."

Mid-West first argues that there is no evidence to support Plaintiffs' assertion that any member of Mid-West's underwriting department involved in processing Plaintiffs' application for health insurance knew about the accident involving Ethan and Lukas Myers. Indeed, the only evidence that Plaintiffs have presented to demonstrate such knowledge is Mr. Kochan's deposition testimony that he "must have" told the assistant manager or someone else at the local Alliance insurance office from which he worked about the accident. Even assuming that Mid-West's underwriting department knew about the January 22, 2002 accident, their conduct in following Mid-West's underwriting guidelines and soliciting information about Mr. Myers nephrectomy and denying insurance coverage to Plaintiffs when they were unable to obtain this information was not extreme and outrageous as a matter of law. Furthermore, since no insurance had been issued to Plaintiffs prior to the January 22, 2002 accident, Mid-West was within its rights to decline coverage based on the significant changes in the health histories of Ethan and Lukas Myers since the time Plaintiffs submitted their application for insurance. *See* Insurance Application ("no insurance will take effect unless and until the Application is approved by the Company and the policy is delivered to the Applicant ***while the conditions affecting the insurability are and have remained as described herein***....") (emphasis added).

In apparent recognition of the weakness of their outrageous conduct claim, Plaintiffs argue that I should hold Mid-West to a higher standard of care than that which is normally applicable to outrageous conduct claims. In support of this argument, Plaintiffs rely primarily on *Simmons v. Prudential Ins. Co. of Amer.,* 641 F. Supp. 675 (D. Colo. 1986). In *Simmons,* however, the heightened standard of care used in evaluating the plaintiff's outrageous conduct claim arose out of the "special relationship between the insurer and insured." *Id.* at 683. No

such relationship is present in this case. The court's conclusion in *Simmons* that the defendant's conduct may be regarded as outrageous in view of the vulnerable mental state of the insured was likewise supported by the existence of a private insurance contract. *Id.* at 684. In any event, conduct that may not otherwise be outrageous may become so based on the actor's knowledge that the other is particularly susceptible to emotional distress by reason of some physical or mental condition or peculiarity. Restatement(Second) of Torts § 46, cmt f (1965). Since Plaintiffs have failed to present sufficient evidence to support a finding that anyone in Mid-West's underwriting department had knowledge of the tragic accident involving Ethan and Lukas Myers or that Mr. Kochan's knowledge of this accident should be imputed to Mid-West, there is no basis to relax the usual standard for outrageous conduct.

I therefore conclude that reasonable persons could not differ on the question of whether Mid-West's conduct was outrageous, and Mid-West is therefore entitled to judgment on Plaintiffs' outrageous conduct claim as a matter or law.

**E. Plaintiffs' UCDPA Claim**

Both Plaintiffs' Amended Complaint and the Scheduling Order allege that Mid-West's actions violated the UDCPA. As noted by Mid-West, there is no private right of action under the UDCPA. *Showpiece Homes Corp. v. Assurance Co. of Amer.,* 38 P.3d 37, 41 (Colo. 2001). To cure this deficiency, Plaintiffs seek to convert their UCDPA claim into a claim under the Colorado Consumer Protection Act. Plaintiffs cannot, however, assert a new cause of action in a response to a summary judgment motion. Mid-West is entitled to judgment on Plaintiffs' UDCPA claim as a matter of law.

For the reasons set forth above, IT IS HEREBY ORDERED that

1.  Mid-West' Motion for Summary Judgment [Doc # 177] is GRANTED;

2.  Plaintiffs' claims are DISMISSED WITH PREJUDICE;

3.  Final judgment shall enter in favor of Mid-West; and

4.  Mid-West shall be awarded its costs.


Dated: August ___25___, 2008 in Denver, Colorado.


                                        BY THE COURT:


                                        ___s/Lewis T. Babcock_____
                                        LEWIS T. BABCOCK, JUDGE